UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                            :

VINCENT WARREN,                          :         05 Civ. 9590 (RJH)

                                            :

                Plaintiff,                 :

                                            :         **MEMORANDUM**
              - against -                :         **OPINION AND ORDER**

                                            :

GLENN GOORD, et al.,                :

                                            :

                Defendants.          :

                                            :
------------------------------------------------------------x

*Pro se* plaintiff Vincent Warren ("Plaintiff") brings the instant action under 42 U.S.C. § 1983 against defendants Glenn Goord and William Phillips ("Defendants") for failure to protect him from harm from other inmates in violation of his Eighth Amendment rights. Plaintiff asserts that Defendants' failure to install metal detectors at the entrance to a recreation yard in Green Haven Correctional Facility ("Green Haven") constituted deliberate indifference to the risk to inmates in this yard of violence from other inmates. Defendants have moved for summary judgment, asserting that neither Goord nor Phillips acted with the requisite mental state, and that both defendants are entitled to qualified immunity.

## FACTS

The following summary is based on the parties' motion papers and the evidence cited in connection therewith. Except as noted, the parties do not dispute the following facts:

**The Parties**

Plaintiff is an inmate in the New York State prison system, serving a term of twenty-five years to life for murder in the second degree. (Warren Dep. 5.) From September 2001 to sometime in 2004, Plaintiff was incarcerated at Green Haven. (*Id.* at 9.)[1]

Defendant Goord was the Commissioner of the New York State Department of Correctional Services ("DOCS") from December 3, 1996 to August 31, 2006. (Goord Decl. ¶ 1.) As Commissioner, Goord was responsible for the overall management of the DOCS. (*Id.* ¶ 3.)

Defendant Phillips was the Superintendent of Green Haven from approximately April 2003 until June 2005. (Phillips Decl. ¶ 1.) Green Haven is a maximum-security facility which held approximately two thousand inmates in January 2004. (*Id.* ¶ 3.) As Superintendent, Phillips was generally responsible for overseeing Green Haven's daily operations. (*Id.*) He was also responsible for the safety and security of all inmates and staff, as well as that of visitors and outside volunteers. (*Id.*)

**DOCS Structure and Operation**

The DOCS is responsible for approximately 63,500 inmates at sixty-nine state correctional facilities and one drug treatment facility. (Goord Decl. ¶ 6.) The day-to-day operation of each correctional facility within the DOCS is overseen by the superintendent of that facility. (*Id.* ¶ 3.) The day-to-day operation of each office, division, and bureau within the DOCS is overseen by the head of that particular office, division, or bureau. (*Id.*) Thus, the superintendent and his or her executive staff are responsible for the functioning of each facility. (*Id.* ¶ 6.)

---

[1] The transcript of Vincent Warren's deposition is Exhibit K in Plaintiff's opposition papers.

**Plaintiff's Assault**

On January 1, 2004, Plaintiff was watching television in the E/F recreation yard at Green Haven around 9:00 p.m. when another inmate attacked him with a razor, cutting him across his left cheek. (Opp'n Mem. 3, Exs. A, B, C.) The resulting wound was approximately three inches in length and required twelve stitches to close. (*Id.* at 3, Exs. A, C.)

**Other Assaults in Green Haven Yards**

Between 1995 and 2003, there were 148 inmate-on-inmate assaults in Green Haven yards. (*Id.* Ex. D.) Between 2000 and 2003, there were thirty-seven attacks in the yards, twenty-one in the E/F yard. (*Id.*) Cutting or stabbing weapons were used in thirty of the attacks. (*Id.*)

There were eight inmate-on-inmate assaults in the Green Haven yards in 2003; four of these occurred within ten weeks of Plaintiff's attack. (Phillips Decl. ¶ 29, Ex. A; Opp'n Mem. Ex. D.) Six of these assaults involved weapons.[2] (Phillips Decl. ¶ 29, Ex. A.)

An inmate was stabbed and killed with an unidentified weapon in a July 2003 assault in the E/F yard. (*Id.* ¶¶ 29, 30, Ex. A.) This was the only death of an inmate in a recreation yard during the years that Phillips served as Superintendent at that facility. (*Id.* ¶ 30.)

**Defendants' Knowledge of the Assaults in the Recreation Yards**

Goord was aware that assaults took place at correctional facilities, but had no knowledge of the details of these attacks. (Goord Decl. ¶ 6.) As Commissioner, he did not have a direct role in monitoring the number of assaults or addressing assault-related issues at any facility. (*Id.*)

---

[2] Two of the incidents involved no weapons, three involved metal weapons, one involved a plexiglass weapon, and two involved weapons that were not recovered. (Phillips Decl. Ex. A.)

While department heads at DOCS would review assaults occurring within the system, only an extraordinary situation would be brought to Goord's attention. (*Id.* ¶ 7.)

Goord was named as a defendant in a 1999 action filed by a Green Haven inmate asserting claims based on, *inter alia*, the failure of Green Haven staff to install metal detectors at the entrance to the recreation yard. (Opp'n Mem. 15); *Coronado v. Goord*, 99 Civ. 1674 (RWS), 2000 WL 1372834 (S.D.N.Y. Sept. 25, 2000).

Phillips was aware that inmates could bring weapons, including razors and both metal and non-metal shanks, into the yards. (Phillips Decl. ¶ 13.) He was also aware of the fatal assault in July 2003 and was aware that weapons had been found in the E/F yard. (Opp'n Mem. Ex. F.)

**Security Measures at Green Haven**

To prevent inmates from bringing weapons into the recreation yards, Green Haven subjected inmates entering the yard to random frisks and random inspection using a hand-held metal detector or metal detector chair. (Phillips Decl. ¶ 13.) If the facility received a tip that something might happen in one of the yards, all inmates would be screened with a hand-held metal detector prior to entering the yard. (*Id.* ¶ 14.)

Corrections officers were physically present in the yard during recreation. (*Id.* ¶ 17.) During weekdays and non-holidays in January 2004, two officers were assigned to the E/F yard during morning and afternoon recreation, and three were assigned to the yard for evening recreation. (*Id.* ¶ 18.) In addition, two officers were assigned to the roof post overlooking the

yard for all recreation periods. (*Id.*) On holidays and weekends, there were up to four officers in the yard and one or two officers on the roof, depending on the time of day. (*Id.*)[3]

Corrections officers regularly performed visual inspections of the E/F yard and bathroom. (*Id.* ¶ 15.) If an area of the yard showed signs that something had been buried or concealed, that area was immediately searched. (*Id.*) In addition, Green Haven staff periodically frisked the yard and swept it with metal detectors. (*Id.*)

After the July 2003 assault, Green Haven reviewed and made changes to its recreation procedures, reducing the number of inmates permitted in the yard at one time from approximately 300 to between 50 and 100 in morning and afternoon recreation sessions, removing wooden benches and tables from the yard, and replacing wooden weight benches with metal ones. (*Id.* ¶ 30.)

**The Parties' Contentions Regarding Metal Detectors and Other Security Measures**

According to Defendants, the recreation period is not long enough to permit 250 to 300 inmates to remove their shoes, belts, jackets, and other articles and pass through a metal detector before entering the yard.[4] (*Id.* ¶ 21.) Defendants assert that inmates frequently complain if they lose any portion of their recreation time and that denying recreation time to inmates would create additional problems at the facility. (*Id.*)

Defendants argue that the installation of metal detectors would not prevent weapons from entering the recreation yards for a number of reasons:

---

[3] In January 2004, there were between 50 and 100 inmates in the yard during morning recreation, between 200 and 250 inmates during evening recreation, and between 200 and 350 inmates on weekends and holidays. (Phillips Decl. ¶¶ 18, 19.)

[4] Defendants note that they are required to provide inmates with a certain amount of recreation time in the yards. (Phillips Decl. ¶ 21.)

5

First, Defendants point out that inmates are known to make weapons out of plexiglass, which will not trigger a metal detector. (*Id.* ¶ 22.) Plaintiff does not respond to this argument.

Second, Defendants claim that inmates have been known to sew razors into the lining of their pants so that they cannot be distinguished from the metal zipper by a metal detector and suggest that inmates would use this tactic to foil the metal detector. (*Id.* ¶ 23.) Plaintiff responds that, in fact, the zippers in the inmates' pants do not trigger the metal detectors. (Opp'n Mem. 7.)

Third, Defendants assert that inmates "routinely" throw weapons into the yard through windows facing the yard that are either broken by the inmates or left open to admit fresh air. (Phillips Decl. ¶ 24.) Defendants further assert that they installed screens on windows but that "the inmates were able to get around them as well." (*Id.*) Plaintiff claims that Green Haven did not install screens or make any efforts to prevent inmates from throwing weapons through windows in prison corridors facing the yard. (Opp'n Mem. 7, 14.)

Defendants further point out that an inmate can commit an assault in the yard without a weapon or by using weight bars or other exercise equipment. (Phillips Decl. ¶ 27.) Inmates can also be assaulted in other areas of the prison where prisoners come in contact with one another. (*Id.* ¶ 28.)

Finally, Phillips states that he did not have authority to install metal detectors in Green Haven because doing so would require authorization from the DOCS Central Office in Albany. (*Id.* ¶ 12.) Plaintiff notes that Phillips requested funding and authorization in 2003 to place a third officer in the yards during evening recreation, and could have taken similar steps to install metal detectors. (Opp'n Mem. 14.)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears the burden of demonstrating that no genuine issue of fact exists for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the moving party makes this showing, the burden shifts to the nonmoving party to demonstrate the existence of an issue of material fact. *Id.* In order to defeat a motion for summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(c)).

"When a pro se litigant is involved, although the same standards for summary judgment apply, the pro se litigant 'should be given special latitude in responding to a summary judgment motion.'"[5] *Knowles v. New York City Dept. of Corr.*, 904 F. Supp. 217, 220 (S.D.N.Y. 1995) (quoting *Gonzalez v. Long*, 889 F. Supp. 639, 642 (E.D.N.Y. 1995)); *see also Graham v.*

---

[5] Plaintiff has not submitted a statement of material facts in dispute, as required by Local Rule 56.1. Because Defendants do not object to Plaintiffs' procedural error, and in light of plaintiff's *pro se* status, the Court "will excuse his failure to comply with the rules, and treat his opposition papers as though they contained a counterstatement under Rule 56.1." *Sease v. Phillips*, No. 06 Civ. 3663 (PKC), 2008 WL 2901966, at *1 n.1 (S.D.N.Y. July 24, 2008); *see Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."). "[T]o the extent that [the plaintiff] sets forth facts based upon personal knowledge in his signed briefs, his affidavits and his Rule 56.1 Statement, the Court will consider those facts and will not deem admitted contrary facts in the [defendant's] Rule 56.1 Statement." *McAllister v. New York City Police Dep't*, 49 F. Supp. 2d 688, 693 n.2 (S.D.N.Y. 1999).

*Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) ("[S]pecial solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment.").

### II.     Eighth Amendment Claim

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "Prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*¸ 511 U.S. 825, 833 (1994) (citations omitted). A prisoner may bring a § 1983 action under some circumstances for violation of his or her Eighth Amendment rights when prison officials have failed to adequately protect the prisoner from danger within the prison. *Id.* at 823. However, "not . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. Rather, in order to establish liability, an inmate must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm, and that (2) the defendants acted with "a sufficiently culpable state of mind." *Id.*

### A.     Substantial Risk of Serious Harm

To prevail on his failure to protect claim, Plaintiff must first show that he or she was "incarcerated under conditions posing a substantial risk of serious harm." *Hayes v. New York*

*City Dept. of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). Defendants do not dispute this element in their motion papers. The Court finds that Plaintiff has met his burden on this issue. Indeed, other courts in this district have found this element satisfied where the plaintiff suffered a similar injury. *See Knowles*, 904 F. Supp. at 221 (finding that "a deep cut to his face which required sixty stitches to close" after being "suddenly and unexpectedly slashed with a sharp instrument possessed by a fellow inmate . . . easily satisfies the objective element of an Eighth Amendment claim." (citations omitted)); *King v. Dept. of Corr.*, No. 95 Civ. 3057, 1998 WL 67669, at *6 (S.D.N.Y. Feb. 18, 1998) (finding that a cut to the plaintiff's face, neck, and shoulder that required twelve to thirteen stitches satisfied the objective requirement).

### B. Culpable State of Mind

Plaintiff also must show that prison officials acted with "a sufficiently culpable state of mind," specifically "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citations omitted) (citing *Farmer*, 511 U.S. at 536–37, 539–40); *see also Hayes*, 84 F.3d at 620 (2d Cir. 1996) ("[T]o state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice."); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm."). A prison official will be found to have acted with deliberate indifference if (1) he "knows that inmates face a substantial risk of serious harm"; and (2)

"disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

### 1. Knowledge

The knowledge prong of the inquiry does not require awareness of the specific risk to the plaintiff or from the assailant. *Farmer*, 511 U.S. at 843; *Hayes*, 84 F.3d at 621. Rather, the risk of attack may come from "a single source or multiple sources" and may be based on "reasons personal to [the plaintiff] or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843. A factfinder may "conclude that a prison official knew of a substantial risk form the very fact that the risk was obvious." *Id.* at 842. For example, if there is "evidence that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past and the circumstances suggest that the [defendant] . . . had been exposed to information concerning the risk," a factfinder may infer that the defendant had actual knowledge of the risk. *Id.* at 842–43.

Plaintiff has presented evidence showing a history of inmate-on-inmate violence in the recreation yards at Green Haven. There were thirty-seven incidents in the yards in the four years preceding plaintiff's attack and four incidents within ten weeks of the attack. (Opp'n Mem. Ex. D). One inmate was killed in an attack the previous summer. (*Id.*)

Plaintiff has offered no evidence suggesting that Goord had knowledge of these attacks. The undisputed evidence is that Goord, while being aware that some assaults took place at correctional facilities, did not have knowledge "of the particulars of each assault," did not directly monitor the number of assaults at the facilities and, and did not address assault-related issues (Goord Decl. ¶ 6). The only evidence Plaintiff claims demonstrates Goord's knowledge is

the fact that Goord was named as a defendant in a similar lawsuit in 1999, thus putting him "on notice" of the danger. (Opp'n Mem. 19.) The fact that another inmate made similar allegations in an action that was dismissed at the pleadings stage years before Plaintiff's attack does not support the inference that Goord had actual knowledge of any risk at the time of the attack.

With respect to Phillips, Defendants' own evidence indicates that, as the superintendent of Green Haven, Phillips oversaw the day-to-day operation of that facility and was responsible for the safety and security of all inmates. Furthermore, Phillips has admitted that he was aware that an inmate had been killed by another inmate in July 2003, that weapons had been found in the dirt in the E/F yard (Opp'n Mem. Ex. E), and that inmates were able to bring weapons into the exercise yards (Phillips Decl. ¶ 13). Phillips also states that Green Haven instituted random frisking and metal detector searches of inmates to deal with the problem of inmates carrying weapons into the yards (*id.*), and that the facility made changes to its recreation yard procedures following the fatal attack in July 2003 (*id.* ¶ 30). This evidence is clearly sufficient to raise a genuine issue of material fact regarding whether Phillips had actual knowledge that inmates in Green Haven recreation yards faced a substantial risk of being assaulted by other inmates.

Defendants argue that, because Plaintiff was unaware that he was personally at risk of assault and never informed Defendants of any risk, they could not have had knowledge of any danger, (Defs.' Mem. 7; Reply Mem. 3), relying on *Patrick v. Amicucci*, No. 05 Civ. 5206 (GEL), 2007 WL 840124, at *3 (S.D.N.Y. Mar. 15, 2007), for its statement that, because "[plaintiff] never advised defendants of any threat against him . . . [and] he was unaware of any danger . . . there was no threat for defendants to ignore, and certainly no awareness on the part of defendants of any risk to [plaintiff]."

With respect to Plaintiff's own awareness, the deposition testimony cited by Defendants does not indicate that Plaintiff "was unaware that he might be at risk of being assaulted by another prisoner" (Reply Mem. 3), but only that, at the time of his attack, he did not expect retaliation from his former gang for his decision to leave the gang (Warren Dep. 33–34, 41). With respect to Plaintiff's failure to inform Defendants of the alleged danger, "failure to give advance notice is not dispositive." *Farmer*, 511 U.S. 848. Furthermore in *Patrick*, the plaintiff claimed that pretrial housing of state and federal prisoners in the same housing unit created a danger of attacks, but offered no evidence that this practice "presented any danger to anyone." *Patrick*, 2007 WL 840124, at *4. The instant plaintiff, by contrast, has offered evidence from which a reasonable factfinder could conclude that there was a danger and that Phillips knew of that danger.

## 2. Failure to Act Reasonably

A prison official does not act with deliberate indifference unless, in addition to knowing of a risk to an inmate, he or she "disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. That is, even if a prison official is aware of a risk, he "may be found free of liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. To prevail, a plaintiff must show that the prison officials "had the ability to take some [reasonable] action that would have significantly alleviated" the risk yet failed to do so. *Shepherd v. Hogan*, 181 Fed. Appx. 93, 96 (2d Cir. 2006). Plaintiff has not made such a showing.

Plaintiff's only argument that defendants failed to act reasonably is that defendants failed to install metal detectors at the entrance to the recreation yard. (Opp'n Mem. 21–22.) However,

12

plaintiff has offered no evidence to indicate that Defendants did not take "reasonable measures" to address the risk that inmates would carry weapons into the yard or that the presence of metal detectors would have "significantly alleviated" the risk to Plaintiff or other inmates.

Green Haven had in place other security measures to address the dangers of attacks in the yards, including random frisks and metal detector screenings (Phillips Decl. ¶ 13), more extensive screenings when alerted to specific dangers (*id.* ¶ 14), placement of prison officers in the yard during exercise periods (*id.* ¶ 18), and regular visual inspections and periodic metal detector sweeps of the yard (*id.* ¶ 15). Plaintiff has produced no evidence suggesting that it was unreasonable for Defendants to address the problem of violence in the recreation yards using the methods chosen, rather than with permanent metal detectors.

In particular, Plaintiff offers nothing but his own conclusory statements to support the argument that metal detectors would significantly reduce the risk to inmates of being assaulted by other inmates. As Defendants point out, inmates can and do commit assaults with non-metal weapons and with their bodies and have other ways of getting weapons into the yards or, indeed, to other areas in the facility. While the system in place at Green Haven may not be infallible, no reasonable factfinder could conclude on this record that Defendants "disregard[ed] an excessive risk to [plaintiff's] . . . safety" by failing to adopt Plaintiff's proposed security measures. *Farmer*, 511 U.S. at 837; *see Blaylock v. Borden*, 547 F. Supp. 2d 305, 311–13 (S.D.N.Y. 2008) (granting summary judgment on failure to protect claim, holding that defendant prison officer took reasonable measures to stop altercation between inmates by ordering inmates to stop fighting and calling for assistance and finding no issue of fact raised by plaintiff's argument that defendant should have physically intervened); *Fair v. Weiburg*, 02 Civ. 9218, 2006 WL 2801999, at *6 (S.D.N.Y. Sept. 28, 2006) (granting summary judgment on failure to protect

13

claim and rejecting plaintiff's argument that defendants acted with deliberate indifference by failing to post a guard in a position from which attack on plaintiff could have been prevented).

Because Plaintiff has not met his burden at summary judgment to "come forward with specific facts showing that there is a genuine issue for trial," *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted), Defendants' motion must be granted.[6]

## CONCLUSION

For the reasons discussed herein, Defendants' motion for summary judgment **[25]** is granted. The clerk of the court is directed to close this case.

SO ORDERED.

Dated: New York, New York
      September 30, 2008

                                                Richard J. Holwell
                                        United States District Judge

---

[6] Defendants also assert that they are entitled to qualified immunity. "Qualified immunity shields government officials from civil suits for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Court applies a two-part test to determine whether qualified immunity applies. First, the court must determine whether the facts, viewed in the light most favorable to the plaintiff, show that the defendants violated a constitutional right. *Scott v. Harris*, 127 S. Ct. 1769, 1774–75 (2007). Second, "[i]f, and only if, the court finds a violation of a constitutional right," the court considers "'whether the right was clearly established . . . in light of the specific context of the case.'" *Id.* at 1774 (quoting *Saucier v. Katz*, 533 U.S. 194, 201–06 (2001)). In light of the Court's finding that Defendants did not violate Plaintiff's Eighth Amendment rights, Defendants are also entitled to summary judgment on the basis of qualified immunity.